# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

Nº 06-CV-2875 (JFB)

## STEPHEN G. SCHULZ,

Petitioner,

VERSUS

## LUIS R. MARSHALL,
## SUPERINTENDENT OF THE WALLKILL CORRECTIONAL FACILITY,

Respondent.

## MEMORANDUM AND ORDER
November 19, 2007

Joseph F. Bianco, District Judge:

Stephen G. Schulz ("petitioner" or "Schulz") petitions this Court for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254, challenging his conviction in state court for robbery (the "petition"). In a judgment rendered on September 2, 1999, following a jury trial in the Supreme Court of the State of New York, Suffolk County (the "trial court"), petitioner was convicted of robbery in the first degree, and was sentenced to a term of eleven years' imprisonment.

This is an extremely troubling case. The conviction, based upon the identification testimony of a single eyewitness, has been the subject of over five years of litigation in the state court, including a dissenting opinion by Judge Rosenblatt in the New York Court of Appeals decision affirming the conviction, in which Judge Rosenblatt concluded that "[o]n the record before us, the possibility of the defendant's actual innocence is too high to justify denial of the CPL 440.10 motion without a hearing." *People v. Schulz*, 4 N.Y.3d 521, 531 (2005) (Rosenblatt, J., dissenting). The conviction relates to the February 3, 1999 robbery by one perpetrator at the El Classico Restaurant ("El Classico") in Brentwood, New York (the "El Classico Robbery"). At the trial, Jose Velasquez ("Velasquez"), the owner and cook of the restaurant, testified that he heard the waitress, Otilia Ruiz ("Ruiz"), scream and, when he walked into the dining area, saw the robber leaving the restaurant. Velasquez unsuccessfully chased the getaway car, but testified that the car contained both a "T" and a "1" in the license plate. Although Velasquez identified the petitioner as the robber at trial,

Ruiz was unable to identify the petitioner in court as the robber, and the car that the prosecution argued had been petitioner's getaway car did not have a "T" or a "1" in the license plate (and had a New York Yankees insignia, which Velasquez had not mentioned).

The defense sought to demonstrate at trial that the El Classico Robbery was committed by an individual named Anthony Guilfoyle ("Guilfoyle"), who had some similar physical characteristics to the petitioner and had been arrested for numerous robberies in Suffolk County, New York ("Suffolk County"), including a robbery on the same night of the El Classico Robbery that occurred approximately three hours earlier, at a location about 10-12 miles away. However, the trial court precluded the defense from introducing a photograph of Guilfoyle (the "Guilfoyle photograph") at trial because the defense failed to establish a sufficient evidentiary basis to argue that Guilfoyle was the robber.[1] Based essentially upon the identification testimony of Velasquez, the jury found the petitioner guilty.

Petitioner argues that certain decisions by his lawyer during the trial were constitutionally deficient and warrant *habeas* relief. Although petitioner points to a number of alleged deficiencies, there are two critical decisions that are the focus of this Court's inquiry. First, Schulz's attorney failed to interview Ruiz outside the courtroom prior to her testimony and then did not cross-examine her at trial. The attorney later stated in an affidavit that, as a matter of trial strategy, he wanted to interview Ruiz shortly before her testimony, but that the prosecutor refused to let him do so. When the Brooklyn Law School's Second Look Clinic

interviewed Ruiz after the trial, Ruiz, who had no apparent motive to lie, stated in an affidavit that: (1) when the police showed her a photo array one day after the robbery, Velasquez (who was serving as an interpreter during the police interview) pointed at petitioner's photograph and told her that he was the person who had committed the crime; (2) prior to trial, Velasquez told her that, if she did not help put Schulz in jail, Schulz would be released from jail and hurt her; and (3) the petitioner did not commit the crime and, after being shown Guilfoyle's photograph, she was "90% certain" that Guilfoyle was the robber. She stated in that affidavit that she is "certain that Stephen Schulz has been convicted of a crime that he did not commit." Second, petitioner points to a post-trial affidavit from his roommate, Anthony Tralongo ("Tralongo"), stating that he was in the courthouse during the trial prepared to testify as an alibi witness for the petitioner because the petitioner was with him in their apartment at the time of the El Classico Robbery, but he never testified at the trial because petitioner's attorney told him that they did not need him.

As discussed in detail below, having carefully reviewed the state court record and having conducted an evidentiary hearing on this issue, this Court concludes that trial counsel's performance in this trial fell well below the *Strickland* standard and that the state court failed to properly consider these deficiencies and the resulting undeniable prejudice that the conduct had on the verdict. Even apart from whether the alibi witness was called to testify, there is no question in the Court's mind that, had Ruiz been interviewed by defense counsel prior to her testimony and then provided the above testimony at the trial through his questioning (which would have, among other things, permitted the Guilfoyle photograph to be admitted), there is a reasonable likelihood that the jury would not have convicted the defendant based on the

---

[1] Annexed to this Memorandum and Order as Exhibit A is a photograph of petitioner (on the left) and a photograph of Guilfoyle (on the right) contained in the state record.

single identification made by Velasquez, especially in light of the other weaknesses in the prosecution case. In short, although the Court recognizes the deferential standard of review, this Court concludes for the reasons set forth *infra* that the state court unreasonably applied *Strickland* to the facts of this case and, thus, the extraordinary remedy of *habeas* relief is warranted.

## I. TRIAL

### A. THE PROSECUTION'S CASE

Schulz's trial commenced on August 30, 1999. As described below, three witnesses testified against him: Ruiz, Velasquez, and Detective Gary Gieck ("Detective Gieck"). The prosecution did not present any forensic evidence.

#### (1) VELASQUEZ

Velasquez testified that, at approximately 8:20 p.m. on February 3, 1999, a customer entered El Classico and placed a takeout order. (Trial Transcript ("T.")284, 288.) The customer was "tall, like 6'2", heavy, weigh like 250-275." (T.284.) At the time, Ruiz was behind the counter. (T.288.) As Velasquez was preparing the order in the kitchen, the customer remained in the dining area of the restaurant with Ruiz. (T.288-90.) Velasquez heard Ruiz yelling, and returned from the kitchen. (T.290.) The customer, now an apparent robber, said "[d]on't move" to Velasquez, and left the restaurant. (T.292.) Velasquez observed the robber get into a "four-door, 2-tone" car with a T and a 1 on the license plate. (T.293.) Velasquez gave chase in his car, but did not apprehend the robber. (T.293.)

Velasquez identified Schulz as the robber in court. (T.294.) Velasquez also confirmed having identified the car belonging to petitioner's roommate from among approximately twenty cars at the police precinct on February 5, 1999, (T.296-300), and having identified petitioner in two lineups on March 16, 1999 (T.300-01).

On cross-examination, Barry J. Levine, Esq. ("Levine"), Schulz's attorney, elicited from Velasquez that the license plate of the car Velasquez identified on February 5, 1999 bore a New York Yankees insignia, which Velasquez had not mentioned to the police, and contained neither a "T" nor a "1." (T.319.) Velasquez also admitted that at the time of the robbery, he had a pending gun possession charge, about which he consulted with one of the officers who investigated the El Classico robbery, Detective Lawrence Conde ("Detective Conde"), to determine whether the pending charge could affect El Classico's liquor license. (T.350-51.) Velasquez could not recall when he spoke to Detective Conde, (T.351), but pleaded guilty to disorderly conduct on February 18, 1999 in satisfaction of the gun possession charge. (T.353.) Velasquez testified that he did not receive a deal on this charge from the Suffolk County District Attorney's Office (the "DA's Office") in exchange for his testimony. (T.354-55.)

#### (2) RUIZ

Ruiz testified that a customer came into El Classico at approximately 8:20 p.m. on the night of the El Classico Robbery. (T.358.) After placing a takeout order with Velasquez, the customer asked Ruiz for "a dollar." (T.358.) Ruiz did not give him the dollar, and the customer proceeded to open the cash register and put money in his pockets. (T.362.) Ruiz screamed and begged the apparent robber to stop. (T.362.) Then, "the man, all of a sudden, pulled out a knife, and put it right in front of" Ruiz. (T.362.) Velasquez emerged from the kitchen and attempted to chase the robber. (T.363.) Ruiz remembered that the

robber was "a very fat man, a very tall, fat man." (T.364.) Ruiz stated several times, however, that the robber was not in the courtroom. (T.364.) Ruiz also stated that she felt "dizzy" and did not want to be in court. (T.366.) Levine declined to cross-examine Ruiz. (T.369.)[2]

### (3) TESTIMONY OF DETECTIVE GIECK

At trial, Detective Gieck of the Suffolk County Police Department testified regarding the investigation of the El Classico Robbery. Detective Gieck stated that on the night of this robbery, he learned from Detective Conde that the suspect was a "white male approximately 6'2" tall, 250 pounds, big build, with rotten teeth." (T.154.) In particular, Detective Conde identified Schulz as a suspect to Detective Gieck because "two police officers had furnished that name to Detective Conde." (T.155.) Detective Gieck did not explain how the two police officers determined that Schulz was a suspect.

Detective Gieck further stated that he went to Schulz's home on February 4, 1999 and saw a "2-tone brown Chevy Celebrity," matching Velasquez's description of the robber's car, in petitioner's driveway. (T.157.) Detective Gieck arrested Schulz and later determined that the car belonged to Tralongo. (T.161-62.)

On cross-examination, Levine asked Detective Gieck about a "whole string of robberies" that took place in his precinct. (T.256.) Gieck stated that these robberies were committed by "Guilfoyle." (T.256.) Detective Gieck conceded that both Schulz and Guilfoyle

were "big guy[s]," (T.259), but denied that the "description" of both men was "similar." (T.256).

### B. THE GUILFOYLE PHOTOGRAPH

At the close of the prosecution's case, Levine moved to admit the Guilfoyle photograph into evidence on the grounds that Guilfoyle's robberies took place in the same time period and general location as the El Classico Robbery.[3] (T.384-85.) Levine pointed out that the victims of Guilfoyle's robberies had described him as "big"– consistent with Ruiz's description of the El Classico robber – and noted that Detective Gieck had testified that Guilfoyle weighed approximately 450 lbs. (T.385.)[4] Levine stated that he intended to call Detective Lawes of the Third Precinct in order to elicit testimony that Guilfoyle had the same *modus operandi* as the El Classico robber. (T.385-86.) The prosecution objected, pointing out that Guilfoyle -- unlike the El Classico robber – used a gun during his robberies.[5] (T.386.)

---

[2] Ruiz also identified Schulz in a photo array on February 4, 1999, (*see* Transcript of Wade Hearing, dated April 17, 2000), but the trial court did not permit the prosecution to present evidence of the out-of-court identification to the jury. (T.253.)

[3] Levine also moved to dismiss the charges against Schulz on the grounds that the prosecution had not made a *prima facie* case of robbery. (T.376.) The trial court denied this motion. (T.410.)

[4] Levine also stated that Ruiz suggested that the robber "was heavier and had a rounder face" than Schulz because during her testimony she "blew up her cheeks and put her hand in a cupping position around the side of her face." (T.385.)

[5] It should be noted that in addition to a robbery in West Babylon at 5:18 p.m. on the night of the February 3, 1999 El Classico Robbery, Guilfoyle's robbery spree in Suffolk County included the following other robberies in early 1999: (1) January 27, 1999 (J.J. French Dry Cleaners, Bay Shore); (2) January 27, 1999 (Floral Splendor Flower Shop, Islip Terrace); (3) February 1, 1999 (Carousel Hair Salon, West Babylon); (4) February 3, 1999 (Deer Park); (5) February 5, 1999 (All the Best Cards and

The trial court indicated that Levine had not presented enough evidence to warrant admission of the Guilfoyle photograph, as Levine had not "shown a sufficient nexus between that suspect or the person that you say committed the crimes, and this crime, to show that that person committed this particular crime." (T.387.) Levine stated that he intended to submit subpoenas to the trial court the following day in order to obtain further evidence about Guilfoyle's robberies. (T.387.)

The following day, the trial court gave Levine and the prosecution an additional opportunity to provide argument regarding the Guilfoyle photograph. (T.415.) Levine does not appear to have submitted any subpoenas for additional documentation of the Guilfoyle robberies. The trial judge denied Levine's request to admit the photograph into evidence. (T.415.)

## C. THE DEFENSE CASE

Although Levine indicated before opening arguments that he would be calling Tralongo as an alibi witness in petitioner's defense, (T.11), petitioner did not call Tralongo to testify. Moreover, Levine did not call two additional detectives to the stand that the prosecution had brought to court at Levine's request, to give testimony about the Guilfoyle robberies. (T.417.) Levine rested the defense case without calling any witnesses to the stand or offering any evidence on petitioner's behalf.

---

Gifts, East Islip); and (6) March 7, 1999 (Islip Laundry, Islip). During at least some of the robberies, Guilfoyle did not display a gun, but rather put his hand in his pocket to pretend that he had a gun. (A. 187-211.)

## D. VERDICT AND SENTENCING

On September 2, 1999, a jury convicted Schulz of robbing the El Classico Restaurant.

On November 1, 1999, the trial court sentenced Schulz, a prior felon, to a determinate term of eleven years' incarceration and five years' post release supervision. At sentencing, Levine pointed out to the trial court that Schulz "has always steadfastly stated . . . that he was not guilty of these offenses." (Sentencing Tr. at 7-8.) Levine noted that petitioner rejected a plea deal that would have required three years' incarceration. (Id. at 10.)

Levine also addressed his decision not to call Tralongo to testify, explaining:

> We chose not to put forth the alibi witness based upon the fact that the victim of this crime failed to identify Mr. Schulz in the courtroom and [Velasquez] testified quite emphatically about a description and a license plate of a vehicle that did not match the license plate. . . . Based upon that and the belief that there was not a proper identification of Mr. Schulz, we did not go forward as we had no burden obviously to do so.

(Id. at 8-9). Levine further suggested that he did not call Tralongo as a witness because of petitioner's prior offenses, explaining: "[T]o put forth the alibi defense and to open the jury's mind as to why [Schulz] didn't testify as to where he was and then having to expose his prior offenses that the Court ruled would be submitted, a determination was made not to present it." (Id. at 9-10.)

5

Levine did not address Guilfoyle's robberies – or the Guilfoyle photograph – at sentencing.

## II. POST-TRIAL PROCEDURAL HISTORY

### A. TRIAL COURT PROCEEDINGS

#### (1) THE AUGUST 14 MOTION

On August 14, 2000, petitioner moved *pro se* under N.Y. Crim. Proc. Law § 440.10(1)(h) to vacate his judgment of conviction on grounds of ineffective assistance of counsel and because the prosecution allegedly failed to prove his guilt beyond a reasonable doubt (the "August 14 Motion"). The trial court denied the August 14 Motion on September 5, 2000.

#### (2) THE OCTOBER 24 MOTION

By 2002, after obtaining counsel through the Second Look Clinic at Brooklyn Law School, petitioner collected a series of additional affidavits and other evidence in support of his motion to vacate his conviction on the basis of newly discovered evidence, pursuant to N.Y. Criminal Procedure Law § 440.10(1)(g) (the "October 24 Motion"). Among the evidence presented in support of the October 24 Motion was the following:

On March 10, 2002, petitioner obtained an affidavit from Ruiz (the "Ruiz Affidavit") reiterating that when she testified at trial, she "did not recognize Mr. Schulz as the person who had committed the robbery and, in fact, [she] had never seen Mr. Schulz in person before. The person who committed the robbery was a taller and much fatter man." (Ruiz Affidavit ¶ 6.) She also recounted that, during her police interview on the day after the robbery, the other eyewitness Velasquez told her to identify petitioner as the robber:

On February 4, 1999, the day after the robbery, the police brought a group of photographs to the El Classico restaurant. Given that I do not speak English, Jose Velasquez, my boss at the restaurant, served as my interpreter during our communications with the police. Jose Velasquez pointed at Stephen Schulz's picture from the group of photographs, and told me that he was the person who had done the crime and that he was in jail.

(*Id.* ¶ 4.) Ruiz also swore that Velasquez told her before trial that "if [she] did not help to put Mr. Schulz in jail, Mr. Schulz would be released and would come back to hurt me."[6] (*Id.* ¶ 5.) In response to viewing a photograph of Guilfoyle, Ruiz further stated: "I am 90% certain that I recognize [Guilfoyle] as the man who robbed me. . . ." (*Id.* ¶ 8.) Ruiz further stated in connection with her post-trial affidavit that "no one had offered [her] anything for coming forward at this time" and that she has "nothing to gain from doing so." (*Id.* ¶ 9.) Finally, she emphasized that "[a]s an eyewitness . . . I am certain that Stephen Schulz has been convicted of a crime that he did not commit." (*Id.*)

On July 15, 2002, petitioner obtained an affidavit from Levine (the "Levine Affidavit") stating that prior to trial, he "made an effort to find Otilia Ruiz, the main eyewitness, but had difficulty contacting her." (Levine Affidavit ¶

---

[6] Ruiz also noted that, "[a]fter the trial, when we were leaving the court, Jose Velasquez asked me why I did not identify Mr. Schulz because it would mean that we would have to keep returning to court, and he insisted that , if I would just identify him, then they would put him in jail and the case would be over." (*Id.*)

6

3.) Levine further stated: "On the day that Ms. Ruiz was scheduled to appear in court, I made an off-the-record request to the prosecution asking if I could interview Ms. Ruiz before she testified. That request was denied. Had I been provided with the opportunity to interview her, I intended to show her a photograph of Mr. Guilfoyle and ask whether he was the person who had robbed her." (*Id.* ¶ 5.)

On February 7, 2002, petitioner obtained an affidavit from Anthony Tralongo (the "February 7 Tralongo Affidavit") stating that Schulz was with Tralongo at their shared residence for the entire evening of the El Classico Robbery. (February 7 Affidavit ¶ 4.) Tralongo further stated: "I was at the trial in Judge John Copertino's courtroom on September 2, 1999, and willing to testify under oath as to Stephen Schulz's alibi. Barry Levine, his defense attorney, never called me to the stand." (*Id.* ¶ 15.)[7]

On February 10, 2003, the trial court denied the October 24 Motion without a hearing. As a threshold matter, the trial court held that because all of the purportedly "newly discovered" evidence was "clearly" available at trial, the "true basis" for the November 24 Motion was the Ruiz Affidavit. (Trial Court Memorandum, dated February 10, 2003 (the "February 10 Memorandum") at 3 n.3.) However, according to the trial court, the Ruiz Affidavit did not contain "newly discovered evidence" because "it cannot be said that Ruiz's

qualified identification of Guilfoyle as the robber could not have been discovered before the trial with due diligence. . . ." (*Id.* at 3.) Specifically, the trial court noted that Levine "made no effort to seek an adjournment or otherwise enlist the court's assistance in securing an opportunity to interview [Ruiz] before she took the stand." (*Id.*)

## B. STATE APPELLATE REVIEW

### 1. APPELLATE DIVISION

On March 29, 2004, the Appellate Division affirmed the judgment of conviction, the August 14 Motion, and the October 24 Motion. *People v. Schulz*, 774 N.Y.S.2d 165, 166 (N.Y. App. Div. 2004).

With respect to the ineffective assistance of counsel claim, the Appellate Division held that:

> The Supreme Court also properly denied the defendant's motions to vacate the judgment of conviction on the grounds of ineffective assistance of counsel pursuant to CPL 440.10. . . . As set forth above, the Supreme Court properly precluded the defendant from introducing evidence of third-party culpability at the trial. Consequently, trial counsel was not ineffective for failure to persuade the trial court to admit such evidence at the trial.

*Schulz*, 774 N.Y.S.2d at 167. The Appellate Division explained that the trial court properly excluded the Guilfoyle photograph at trial under *People v. Primo*, 96 N.Y.2d 351 (2001). *Schulz*, N.Y.S.2d at 167. *Primo* holds that "[t]he admission of evidence of third-party culpability may not rest on mere suspicion or

---

[7] Petitioner also provided documentation of a polygraph test he took on November 12, 2001, the results of which indicated that he spoke truthfully when he denied committing the El Classico Robbery. (*See* Report of Edwin F. Lambert, Wall Street Investigation Services, at 1-2.) However, because of issues regarding the reliability and admissibility of polygraph tests, the Court has not taken this test into account in granting Schulz's petition.

surmise," and courts should require the defense "to make an offer of proof" showing that the probative value of the evidence outweighs its potential for prejudice prior to the evidence's admission. *Primo*, 96 N.Y.2d at 357.

The Appellate Division did not address Levine's failure to call Tralongo as a witness, nor did it address Levine's failure to interview Ruiz prior to her testimony to show her the Guilfoyle photograph, which would have, among other things, provided a basis for its admission.

## 2. COURT OF APPEALS

On May 5, 2005, the Court of Appeals of New York affirmed the decision of the Appellate Division (the "May 5 Decision"). *People v. Schulz*, 4 N.Y.3d 521, 524 (2005).

With respect to the ineffective assistance of counsel claim, the Court of Appeals stated that Levine's failure to call Tralongo as a witness was a "tactical decision." *Id.* at 531. The Court of Appeals did not address Levine's failure to achieve admission of the Guilfoyle photograph in the context of the ineffective assistance of counsel claim. Specifically, it did not address Levine's failure to interview Ruiz and show her the Guilfoyle photograph. Instead, the May 5 Decision affirmed the trial court's rejection of the Guilfoyle photograph because the trial court correctly found that Levine had not laid a sufficient foundation for the photograph's admission under *Primo*. *Id.* at 528. Specifically, the Court of Appeals noted that Levine did not call police officers to testify about the Guilfoyle robberies, and did not cross-examine Ruiz or show her Guilfoyle's photograph. *Id.*

Judge Albert M. Rosenblatt, who wrote the *Primo* decision, dissented in part with the May 5 Decision (the "Rosenblatt dissent"). In particular, Judge Rosenblatt strongly disagreed with the May 5 Decision's affirmance of the trial court's denial of the October 24 Motion without a hearing. *Id.* at 531 (Rosenblatt, J., dissenting in part). Judge Rosenblatt argued that the Ruiz Affidavit "sh[ook] the [trial] court's ruling barring the [Guilfoyle] photograph," *id.* at 534, and that the trial court should have held a hearing for Ruiz to "see Guilfoyle under court-arranged auspices [so that the trial court] could then determine whether the conviction was a miscarriage of justice." *Id.* "On the record before [the Court of Appeals]," Judge Rosenblatt argued, "the possibility of defendant's actual innocence is too high to justify denial of the CPL 440.10 motion without a hearing." *Id.* at 531.

## C. DA's OFFICE RE-INVESTIGATION

In response to Judge Rosenblatt's dissent, the Chief of the Major Crime Bureau of the DA's Office, Peter H. Mayer ("Mayer"), conducted a "re-investigation" of the El-Classico Robbery, and reported the results of this investigation in a letter to the Court of Appeals, dated December 30, 2005. Mayer's investigation, during which he paid "particular attention to whether the crime could have been committed by another," (December 30 Letter at 1), included interviews of Guilfoyle and Velasquez. (*Id.* at 3.) Velasquez "remained consistent and certain concerning the circumstances of the robbery of February 3, 1999 and his identification of the defendant and his vehicle." (*Id.* at 3.) Guilfoyle denied committing the El Classico Robbery, "although his memory was hazy because of his drug use in 1999." (*Id.*) Guilfoyle admitted to committing another robbery on February 3, 1999 in West Babylon (which occurred about three hours before the El Classico robbery and about 10-12 miles away), but "couldn't quite remember what he did after. . . . He conjectured that he probably obtained crack and got high, which was his *modus operandi*." (*Id.* at 4.) Mayer noted that Guilfoyle would

have had enough time to commit the El Classico Robbery after the West Babylon robbery, but in all of Guilfoyle's admitted robberies, he never possessed a weapon. (*Id.* at 3-4.) Mayer also noted that Schulz was 6'2" at the time of his arrest, and weighed 275 lbs., while Guilfoyle was 6'4" and 450 lbs, (*id.* at 3), and that Ruiz's and Velasquez's descriptions of the perpetrator therefore more closely "parallel Schulz." (*Id.* at 4.) Mayer concluded that "Guilfoyle's statements might best be characterized as unreliable but his degree of cooperation and willingness to answer belies any motive of wanting to hide something, particularly armed with the knowledge that the statute of limitations precludes any prosecution of him for this crime. . . . [T]here is simply no reliable evidence to conclude that anyone other than Stephen Schulz committed" the El Classico Robbery. (*Id.* at 4-5.)

D. PROCEEDINGS BEFORE THE COURT

Schulz filed the petition on June 2, 2006,[8] challenging his conviction on the grounds that: (1) he was denied his right to the effective assistance of counsel; (2) insufficient evidence supported his conviction; and (3) newly discovered evidence warrants a new trial. Respondent responded on July 26, 2006. The Court originally scheduled oral argument for August 20, 2007, but petitioner's counsel filed his notice of appearance that day, so the Court adjourned the oral argument and accorded both parties the opportunity to supplement their original submissions.

The Court also determined, by Order dated September 10, 2007 (the "September 10 Order"), that the petition "raised sufficiently serious questions regarding the merits of petitioner's ineffective assistance of counsel claim to warrant an evidentiary hearing" in

addition to oral argument. Sept. 10 Order at 1. In particular, the Court stated that under *Sparman v. Edwards*, 154 F.3d 51 (2d Cir. 1998),"'a district court facing the question of constitutional ineffectiveness of counsel should, except in highly unusual circumstances, offer the assertedly ineffective attorney an opportunity to be heard and to present evidence, in the form of live testimony, affidavits, or briefs.'" September 10 Order at 1 (quoting *Sparman*, 154 F.3d at 52). *See also Cox v. Donnelly*, 387 F.3d 193, 201 (2d Cir. 2004) (remanding to district court "with instructions to give [the petitioner's trial] counsel an opportunity to be heard pursuant to *Sparman*). In keeping with the Second Circuit's holdings in *Sparman* and *Cox*, the Court scheduled an evidentiary hearing and oral argument for October 3, 2007 to address the following issues under the standard for ineffective assistance of counsel set forth in *Strickland*:

> (1) trial counsel's failure to interview [Ruiz] before trial or to show her the photograph of [Guilfoyle], who had been arrested for a series of robberies in Suffolk County during the same time period as the robbery for which petitioner was convicted; (2) trial counsel's failure to show Guilfoyle's photograph to Ms. Ruiz on the witness stand during the trial; (3) trial counsel's failure to develop evidence at trial regarding robberies committed by Guilfoyle which may have, among other things, established a sufficient foundation for the admission of a photograph of Guilfoyle; (4) trial counsel's failure to conduct an adequate pretrial investigation to discover that, in 1999, a car

---

[8] Respondent agrees that Schulz's petition was timely filed and that he properly exhausted all state court remedies.

belonging to Guilfoyle's wife had a license plate that contained the letter "T" and the number "1", as specified in victim [Velasquez's] description of the getaway car's license plate; and (5) trial counsel's failure to call [Tralongo] who stated that petitioner was with him at the time of the crime.

Sept. 10 Order at 2. The Court also ordered Levine to appear at this hearing. *Id.* at 3. However, by letter dated September 12, 2007, petitioner notified the Court that Levine was deceased. At a telephone conference on September 24, 2007, petitioner notified the Court that Tralongo had also passed away. In light of these developments, the Court invited petitioner and respondent to determine whether there were other witnesses and/or evidence that could be presented at the evidentiary hearing, and rescheduled the hearing and oral argument for October 5, 2007 (the "October 5 Hearing").

### 1. THE OCTOBER 5 HEARING

Two witnesses testified at the October 5 Hearing, and both petitioner and respondent gave oral argument. Finally, respondent submitted additional affidavits in opposition to the petition. The evidence adduced at the hearing is summarized below.

Schulz testified on his own behalf. He stated that his planned defense at trial had two components: (1) his alibi witness, Tralongo; and (2) evidence that Guilfoyle had committed the robbery. (October 5 Hearing Tr. at 15.) Petitioner understood prior to trial that the prosecution planned to call both Velasquez and Ruiz to identify Schulz as the robber. (*Id.* at 15-16.) However, at the close of the prosecution's case, after Ruiz repeatedly failed to identify Schulz on the stand, Levine told Schulz that they need not put on a defense. (*Id.*

at 9.) Levine told Schulz that the jury would not convict petitioner because Ruiz failed to identify him and the prosecution had the burden of proof. (*Id.*) Specifically, Levine stated that he would not call Tralongo as petitioner's alibi witness because "it opens doors to cross-examine" Tralongo. (*Id.* at 10.) Levine did not specify "what was bad about Tralongo." (*Id.* at 21.) Schulz did not believe that Tralongo had a criminal record. (*Id.*) The Court found Schulz's testimony regarding these conversations with his attorney to be credible.

Catherine Loeffler, Schulz's prosecutor at trial, also testified. Ms. Loeffler credibly denied having any conversation with Levine "regarding his ability to interview a witness in this case," including denying Levine access to Ruiz, as alleged in the Levine Affidavit. (*Id.* at 31.)

Further, respondent put an additional affidavit by Tralongo into evidence, dated March 17, 1999 (the "March 17 Tralongo Affidavit") and argued that this affidavit contains an account of the evening of the El Classico Robbery materially different from that contained in the February 7 Tralongo Affidavit. (*Id.* at 32-33.) The alleged inconsistencies between the February 7 Tralongo Affidavit and the March 17 Tralongo Affidavit concern, among other things, whether Tralongo or Schulz cooked dinner that night and in which rooms Tralongo and Schulz were respectively watching television. (*Id.* at 72-73.) Respondent admitted that Levine did not have the March 17 Tralongo Affidavit at trial, but stated that the prosecution would have successfully impeached Tralongo with the purportedly inconsistent affidavits if Tralongo testified. (*Id.* at 75.)[9]

---

[9] For convenience of the reader, the Court has not included here, but in the analysis *infra*, the key legal arguments parties offered at the October 5 Hearing. Similarly, respondent submitted an

## III. STANDARD OF REVIEW

### A. THE AEDPA GOVERNS PETITIONER'S CLAIMS

In consider whether to grant the petition, the Court must apply the "deferential" standard of review set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Death Penalty Act of 1996 (the "AEDPA"), to petitioner's claims. *Eze v. Senkowski*, 321 F.3d 110, 120-21 (2d Cir. 2003). The Court thus rejects petitioner's argument that the Court should review petitioner's ineffective assistance of counsel claim *de novo*. (Pet. Mem. at 25-26.) Specifically, petitioner argues that the "AEDPA's deferential standard is limited to claims that were 'adjudicated on the merits in State court proceedings,'" *Eze*, 321 F.3d at 121 (citing 28 U.S.C. § 2254), and that the Appellate Division did not adjudicate the ineffective assistance claim on the merits. The Court rejects this contention.

An adjudication on the merits is a "substantive, rather than a procedural, resolution of a federal claim," *Sellan v. Kuhlman*, 261 F.3d 303, 313 (2d Cir. 2001), and "one that '(1) disposes of the claim on the merits, and (2) reduces its disposition to judgment.'" *Bell v. Miller*, No. 05-5235-pr, 2007 U.S. Dist. LEXIS 20980, at *10-*13 (2d Cir. Aug. 31, 2007) (emphasis omitted) (quoting *Sellan*, 261 F.3d at 312). A court may discuss the merits, but not sufficiently "premise" its decision on these merits to warrant deferential review under the AEDPA. *See Bell*, 2007 U.S. Dist. LEXIS at *11-*12 (noting, for example, that where courts use a "contrary-to-fact construction: *if* the merits *were* reached, the result would be the same," the court did not adjudicate that issue on the merits under the AEDPA) (emphasis in

original). Here, because the Appellate Division directly – albeit briefly – analyzed the ineffective assistance claim, as set forth *supra*, the Court therefore finds that the Appellate Division adjudicated the ineffective assistance claim on the merits and that this claim is subject to deferential AEDPA review.[10]

### B. REVIEW UNDER THE AEDPA

Section 2254, as amended by the AEDPA, provides that:

> (d) An application for a writ of *habeas* corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2554. "'Clearly established Federal law' means 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions

---

affidavit regarding the license plate issue, which is discussed *infra*.

[10] Moreover, the Court wholly rejects petitioner's contention at the October 5 Hearing that the Court should decide whether to grant the petition based on the Court's "comfort level . . . about the facts of the case." (October 5 Hearing Tr. at 45.) The role of the federal court in *habeas* review is not to second-guess state courts based on the "comfort level" of the federal judge, but to apply the law objectively and where appropriate, as in the instant case, with the deference the AEDPA mandates.

as of the time of the relevant state-court decision.'" *Green v. Travis,* 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor,* 529 U.S. 362, 412 (2000)).

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams,* 529 U.S. at 413; *see also Gersten v. Senkowski,* 426 F.3d 588, 606 (2d Cir. 2005). A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Williams,* 529 U.S. at 413; *see also Gersten,* 426 F.3d at 606 ("The 'unreasonable application' language applies where the state court identified the correct legal governing legal principle in the Supreme Court's decisions but applied it unreasonably.").

"An ineffective assistance claim asserted in a *habeas* petition is analyzed under the 'unreasonable application' clause of AEDPA because it is 'past question that the rule set forth in *Strickland* qualifies as clearly established Federal law, as determined by the Supreme Court. . . .' *Lynn v. Bliden,* 443 F.3d 238, 247 (2d Cir. 2006) (quoting *Williams v. Taylor,* 529 U.S. 362, 391 (2000)). Further, because "[u]nreasonableness is determined by an objective standard," *Gersten,* 426 F.3d at 607, "a federal *habeas* court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Gilchrist v. O'Keefe,* 260 F.3d 87, 93 (2d Cir. 2001) (quoting Williams, 529 U.S. at 411). Instead, the Court must find that the state court's application of federal law reflected

"'some increment of incorrectness beyond error.'" *Gersten,* 426 F.3d at 607 (quoting *Henry v. Poole,* 409 F.3d 48, 68 (2d Cir. 2005)). However, "[t]he increment of correctness beyond error . . . need not be great; otherwise, *habeas* relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Yung v. Walker,* 341 F.3d 104, 110 (2d Cir. 2002) (quoting *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir. 2000)).

In the instant case, for the reasons set forth below, the Court finds that petitioner has objectively established that the state court unreasonably applied the *Strickland* standard in considering Schulz's ineffective assistance claim. Although the Court bases its ruling on the totality of Levine's representation, the Court especially grounds its ruling on Levine's failure to interview Ruiz prior to trial, since such an interview was reasonably likely to have given rise to admission of the Guilfoyle photograph -- as well as other evidence of Guilfoyle's potential culpability for the El Classico Robbery -- and there is a reasonable probability the result of the trial would have been different.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

Petitioner claims that he was denied the effective assistance of counsel at trial because Levine failed to: (1) call Tralongo as petitioner's alibi witness; (2) interview Ruiz prior to trial and show her the Guilfoyle photograph; (3) show this photograph to Ruiz on the witness stand; (4) develop the Guilfoyle evidence through the police officers who had been produced in court; and (5) discover that Guilfoyle's wife, Kim, had a license plate containing the letter "T" and the number "1," which was consistent with Velasquez's description of the license plate of the getaway car. The Court finds, for the reasons set forth below, that Levine's failure to call Tralongo at

trial and to interview Ruiz and show her the Guilfoyle photograph prior to trial constitutes ineffective assistance of counsel under *Strickland.* Moreover, the Court concludes that the state court – which addressed the Tralongo issue in a conclusory manner and failed to address the Ruiz issue at all – unreasonably applied *Strickland* to the facts of this case.

## A. THE *STRICKLAND* STANDARD

"The Sixth Amendment guarantees persons charged with crimes the 'assistance of counsel.' U.S. Const. amend. VI. 'It has long been recognized that the right to counsel is the right to the effective assistance of counsel.'" *Eze,* 321 F.3d at 124 (quoting *McMann v. Richardson,* 397 U.S. 759, 771 (1970)).

Under *Strickland,*

> [the] test for ineffective assistance of counsel consists of two separate prongs, both of which must be satisfied in order to establish a constitutional violation. A defendant must show both (1) that defense counsel's performance fell "below an objective standard of reasonableness . . . under prevailing professional norms" and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

*Davis v. Greiner,* 428 F.3d 81, 87 (2d Cir. 2005) (quoting *Strickland,* 466 U.S. at 688, 694); *see also Bell,* 2007 U.S. App. LEXIS at *12 ("A criminal defendant asserting that counsel is constitutionally deficient must show that the lawyer's performance 'fell below an objective standard of reasonableness' and that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'") (citing *Strickland,* 466 U.S. at 688, 694). For the reasons set forth below, the Court finds that petitioner has satisfied both prongs of the *Strickland* test, and that the state court's decision to the contrary was unreasonable.

## B. THE PERFORMANCE OF DEFENSE COUNSEL

In order to meet the first prong of the *Strickland* test, "a defendant must show that counsel's representation 'fell below an objective standard of reasonableness' determined according to 'prevailing professional norms'. . . . Counsel's performance is examined from counsel's perspective at the time of and under the circumstances of trial." *Murden v. Artuz,* 497 F.3d 178, 198 (2d Cir. 2007) (quoting *Strickland,* 466 U.S. 688); *see also Davis,* 428 F.3d at 88 ("When assessing whether or not counsel's performance 'fell below an objective standard of reasonableness . . . under prevailing professional norms,' *Strickland* directs us to consider the circumstances counsel faced at the time of the relevant conduct and to evaluate the conduct from counsel's point of view.") (quoting *Strickland,* 466 U.S. at 688-89). Therefore, "'[j]udicial scrutiny of a counsel's performance must be highly deferential . . . [and] every effort [must] be made to eliminate the distorting effects of hindsight.'" *Cox,* 387 F.3d at 198 (quoting *Strickland,* 466 U.S. at 689); *see also Eze,* 321 F.3d at 125 (explaining scrutiny is deferential because "'it is all too tempting for a defendant to second-guess counsel's assistance after a conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable'") (quoting *Strickland,* 466 U.S. at 689).

In particular, "[a]ctions or omissions by counsel that 'might be considered sound trial

strategy' do not constitute ineffective assistance.'" *United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000) (quoting *Strickland*, 466 U.S. at 689); *see also Bell*, 2007 U.S. App. LEXIS at *16 (explaining that in order to show ineffective assistance, "defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy") (citation and quotation marks omitted); *Lynn v. Bliden*, 443 F.3d 238, 247 (2d Cir. 2006) ("As a general rule, a *habeas* petitioner will be able to demonstrate that a trial counsel's decisions were objectively unreasonable only if there [was] no . . . tactical justification for the course taken.") (citation and quotation marks omitted). For that reason, "[s]trategic choices made by counsel after thorough investigation . . . are virtually unchallengeable . . . and there is a strong presumption that counsel's performance falls 'within the wide range of reasonable professional assistance.'" *Gersten*, 426 F.3d at 607 (quoting *Strickland*, 466 U.S. at 689-90); *see also Pavel v. Hollins*, 261 F.3d 210, 216 (2d Cir. 2001) (explaining that representation is deficient only if, "in light of all the circumstances, the identified acts or omissions were outside the *wide* range of professionally competent assistance") (emphasis in original) (citation and quotation marks omitted).

Finally, in determining whether one or more errors by trial counsel renders the representation constitutionally deficient under the first prong of *Strickland*, the Court "need not decide whether one or another or less than all of these . . . errors would suffice, because *Strickland* directs us to look at the 'totality of the evidence before the judge or jury,' keeping in mind that 'some errors [] have . . . a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture. . . .'" *Linstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 695-96).

Here, the Court has "assess[ed] the impact of [Levine's representation] in the *aggregate*," *Linstadt*, 239 F.3d at 204 (emphasis in original), and, as set forth below, concludes that "ineffectiveness permeated all the evidence." *Id.* at 203.

### (1) Failure to Call Tralongo as a Witness

"Courts applying *Strickland* are especially deferential to defense attorneys' decisions concerning which witnesses to put before the jury. . . . 'The decision not to call a particular witness is typically a question of trial strategy that [reviewing] courts are ill-suited to second-guess.'" *Greiner v. Wells*, 417 F.3d 305, 323 (2d Cir. 2005) (quoting *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998)); *see also Eze*, 321 F.3d at 129 ("A defense counsel's decision not to call a particular witness usually falls under the realm of trial strategy that we are reluctant to disturb."). In fact, depending on the circumstances, even counsel's decision not to call witnesses "that might offer exculpatory evidence . . . is ordinarily not viewed as a lapse in professional representation." *Best*, 219 F.3d at 201.

With respect to alibi witnesses in particular, courts have found that "even if . . . alibi evidence did exist, the trial attorney's decision not to call the purported alibi witnesses was a tactical decision" that does not constitute deficient performance." *Dupont v. United States*, No. 04-6159-pr, 2007 U.S. App. LEXIS 11607, at *4 (2d Cir. May 15, 2007); *see also Perkins v. Comm'r of Corr. Servs.*, No. 06-0608, 2007 U.S. App. LEXIS 4527, at *4-*5 (2d Cir. Feb. 23, 2007) (finding valid "strategic reasons" for failure to call alibi witnesses).

"At the same time, however, the decision not to call a witness must be grounded in some strategy that advances the client's interests." *Eze*, 321 F.3d at 129. The Second Circuit has noted several legitimate, tactical reasons for

failing to call a defense witness. For example, an attorney may choose not to call a witness where that witness' likely testimony is largely unknown to the attorney before trial, or where the witness is "unfriendly" to the defendant. *E.g., Greiner*, 417 F.3d at 323; *see also, e.g., Seow v. Artuz*, 98-CV-72, 2007 U.S. Dist. LEXIS 72208, at *26-*27 (E.D.N.Y. Sept. 27, 2007) (finding decision not to call witness "who was intoxicated and unsure of what he had seen" to be "a tactical choice"). Another reason for choosing not to call a witness is the potential for "opening the door" to potentially damaging testimony about the defendant's character, *e.g., Best*, 219 F.3d at 202, or indeed any "line of inquiry harmful to the defense." *Greiner*, 417 F.3d at 324. Further, the Second Circuit has specifically noted that the failure to call an alibi witness that would likely face effective impeachment cannot constitute ineffective assistance of counsel. *See, e.g., Bennett v. Fischer*, 06-2196-pr, 2007 U.S. App. LEXIS 21136, at *8-*9 (2d Cir. Sept. 4, 2007) (analyzing witness' likely impeachment in context of second prong of *Strickland* test).

Here, respondent has provided no evidence showing that Levine's decision not to call Tralongo resembles any of the "tactical decisions" previously recognized by the Second Circuit. For instance, neither Levine nor respondent has put forth any evidence that Tralongo was more susceptible to cross-examination than any other witness in a criminal trial. The Court has seen no evidence, for example, that Tralongo particularly lacked credibility or even had a criminal record. Nevertheless, Levine and respondent have advanced several justifications for Levine's failure to call Tralongo as a witness. For the reasons set forth below, the Court finds all of these justifications unpersuasive.

Levine stated at sentencing that he did not call Tralongo – and indeed, called no witnesses at all -- because Ruiz failed to identify petitioner and Levine undermined Velasquez on cross-examination. However, "[a]s the Second Circuit has held, a decision not to prepare an adequate defense because a defense lawyer thinks the prosecution's case is weak is not 'strategic.' It is motivated by the desire to avoid work, not to serve the best interests of the defendant." *Garcia v. Portuondo*, 459 F. Supp. 2d 267, 287 (S.D.N.Y. 2006) (citing *Pavel*, 261 F.3d at 218).[11] That the prosecution's case was weaker than Levine initially anticipated does not justify his failure to call Tralongo as a witness.[12]

Further, as petitioner testified at the October 5 Hearing, his alibi represented one of only two components of his defense. The Court cannot objectively justify Levine's choice to halve this defense, leaving available only the Guilfoyle evidence – the admissibility of which Levine surely knew was in question under *Primo. See Bell*, 2007 U.S. App. LEXIS at *17 (holding that where "defense proceeded along two strategic lines," failure to investigate witness that could have "promoted" one of these lines was a deficiency in representation). Even though Ruiz failed to identify Schulz, and Levine was able to undermine Velasquez's identification of petitioner's license plate,

[11] Certainly, the Court does not hold that failure to present a defense constitutes ineffective assistance of counsel *per se*. *Habeas* petitioners cannot succeed based on a "self-serving and conclusory allegation that defense counsel failed to present witnesses," where "petitioner gives no indication as to which witnesses counsel should have presented" or "how these unidentified individuals would have changed the result of the proceeding." *See* generally *Sturdivant v. Barkley*, No. 04-CV-5659, 2007 U.S. Dist. LEXIS 53582, at *19-*20 (E.D.N.Y. July 24, 2007). Here, however, petitioner specifically identified Tralongo and procured an affidavit indicating his likely testimony.

[12] Levine's other argument at sentencing – that Tralongo's testimony would have caused the jury to improperly question Schulz's failure to testify – is similarly unavailing.

Velasquez made an in-court identification of petitioner. As a matter of law, and as Levine surely knew, "the testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction." *See United States v. Frampton* 382 F.3d 213, 222 (2d. Cir. 2004) (citing *United States v. Danzey*, 594 F.2d 905, 916 (2d Cir.1979)); *see also Bentley v. Scully*, 41 F.3d 818, 825 (2d Cir. 1994) (stating that eyewitness testimony and identification constituted a major portion of overwhelming evidence of guilt); *Huber v. Schriver*, 140 F. Supp. 2d 265, 277 (E.D.N.Y. 2001) (holding that testimony of single eyewitness defeated a petitioner's claim of legally insufficient evidence.). In light of this clear precedent for Schulz's conviction, Levine's apparent belief that Schulz's acquittal was guaranteed at the end of the prosecution's case was unreasonable.

In short, the Court thus finds that Levine's wholesale abandonment of Schulz's alibi defense without adequate explanation constituted a constitutional deficiency in Levine's representation. The fact that only one of the two eyewitnesses had identified petitioner at the trial and Levine viewed the prosecution case as weak does not justify the failure to call an alibi witness with no known credibility issues. Levine's other stated reason (at sentencing) for not calling Tralongo – that the jury might wonder why petitioner did not also take the stand – is also insufficient to justify the decision. Even assuming this decision could be viewed in isolation as tactical, the Court must consider this decision in the context of trial counsel's entire performance during the trial. More specifically, in "assess[ing] the impact of [Levine's representation] in the *aggregate*," *Linstadt*, 239 F.3d at 204 (emphasis in original), the Court must consider Levine's failure to call Tralongo in the context of another major decision – namely, the decision not to interview Ruiz prior to her trial testimony to show her the Guilfoyle photograph – which lacked any strategic justification

whatsoever. As discussed below, when the failure to call the alibi witness is considered in conjunction with his inexplicable decision not to interview Ruiz (despite Levine's admission that he wanted to interview her as part of his trial strategy), his representation is clearly deficient under *Strickland*.

### (2) FAILURE TO INTERVIEW RUIZ PRIOR TO TRIAL

The Court finds, for the reasons set forth below, that Levine's failure to interview Ruiz before her trial testimony represented a constitutional deficiency in his counsel under *Strickland*. As a threshold matter, the Court assumes that if Levine interviewed Ruiz and showed her the Guilfoyle photograph, she would have provided information consistent with the Ruiz Affidavit, including that she is 90 percent sure that Guilfoyle committed the robbery and she is "certain that Stephen Schulz has been convicted of a crime he did not commit." (Ruiz Affadvit ¶¶ 6-9.) The Court is confident in this assumption because respondent has provided no grounds to discredit the Ruiz Affidavit or to believe that she would have hid this information from Levine if he had interviewed her prior to her trial testimony (or cross-examined her).

Although respondent tries to suggest that there was some tactical or strategic reason not to interview Ruiz (October 5 Hearing Tr. at 64-70), that argument is wholly contradicted by the record. Specifically, in the Levine Affidavit, Levine conceded that he wanted to interview Ruiz prior to her testimony and show her the Guilfoyle photograph. The *sole* reason given by Levine for not conducting that interview was that the prosecutor denied his request to speak with Ruiz on the day of her anticipated trial testimony. However, as a threshold matter, the prosecutor testified at the evidentiary hearing before this Court and emphatically stated that this conversation – in which Levine claims she denied him access to

Ruiz on the day of her trial testimony – "never happened." (Tr. at 31) The prosecutor further testified that she never had any conversation whatsoever with Levine regarding his ability to interview a witness in the case. (*Id.*) Thus, respondent credibly undermined the only reason given for Levine's failure to interview Ruiz. However, even assuming *arguendo* that Levine's affidavit is accurate and the prosecution refused to allow him to interview the witness, the decision to abandon such an interview attempt certainly cannot be considered strategic. As set forth below, under "prevailing professional norms," Levine clearly should have known that he could have sought the trial court's help in securing a pre-trial interview of Ruiz, and his failure to interview this critical witness under the circumstances of this case was a constitutional deficiency under *Strickland*.

### (a) STANDARD FOR PRE-TRIAL INVESTIGATION AND IMPORTANCE OF RUIZ INTERVIEW

In preparing for trial, "'[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" *Lindstadt*, 239 F.3d at 200 (quoting *Strickland*, 466 U.S. at 691); *see also Wiggins v. Smith*, 539 U.S. 510, 533 (2003) ("[S]trategic choices made after less than complete investigation are reasonable only to the extent that reasonable professional judgments support the limitations on investigation."); *Gersten*, 426 F.3d at 607 ("[C]ounsel has a duty to make reasonable investigations, and a decision not to investigate will be reasonable only to the extent that reasonable professional judgments support the limitations on investigation.") (citation and quotation marks omitted).

Specifically, reasonable decisions not to pursue an avenue of investigation encompass cases "where counsel . . . cease[d] further investigation as a result of having discovered .

. . evidence . . . to suggest that challenging the prosecution's . . . evidence would have been counterproductive, or that further investigation would have been fruitless," or where counsel has "good reason to think further investigation would be a waste." *Gersten*, 426 F.3d at 610 (citation and quotation marks omitted); *see also Robles v. Superintendent of the Elmira Facility*, No. 07 Civ. 596, 2007 U.S. Dist. LEXIS 64809, at *17 (S.D.N.Y. Aug. 30, 2007) (finding counsel had not erred in failing to pursue potential witness that was likely to be "poorly performing" and "uncooperative"); *Hernandez v. Greene*, No. 05-CV-5291, 2007 U.S. Dist. LEXIS 9049, at *24-*25 (E.D.N.Y. Feb. 8, 2007) (finding counsel had not erred in failing to pursue potential witness whose account of the relevant events would not be inconsistent with prosecution's case).[13]

Here, the Court finds that Levine breached his duty to investigate Schulz's case diligently. The Court finds that Levine's failure to interview Ruiz was unreasonable and fell below professional norms for counsel's representation. Levine had nothing to lose by interviewing Ruiz; either she would maintain her identification of Schulz as the robber, simply continuing the status quo, or she would help to acquit him by enabling Levine to

---

[13] In evaluating claims of ineffective assistance of counsel based on failure to investigate witnesses, courts place weight on a defendant's ability to show that these witnesses would have had helpful information. *See, e.g., Ward v. Kuhlman*, No. 9:01-CV-1054, 2007 U.S. Dist. LEXIS 74470, at *19-*20 (N.D.N.Y. Oct. 4, 2007); *Prousalis v. United States*, No. 06 Civ. 12946, 2007 U.S. Dist. LEXIS 63025, at *29 (S.D.N.Y. Aug. 24, 2007) (rejecting such claim where petitioner did not show that witness would have had exculpatory information); *Ramdeo v. Phillips*, No. 04-CV-1157, 2007 U.S. Dist. LEXIS 49483, at *86-*87 (E.D.N.Y. July 9, 2007) (same).

introduce the Guilfoyle photograph.[14] While the Court "will not normally fault counsel for foregoing a potentially fruitful course of conduct if that choice also entails a 'significant potential downside,'" *Greiner*, 417 F.3d at 319, interviewing Ruiz prior to trial entailed no "downside" at all, significant or otherwise. Since the Guilfoyle evidence represented one-half of Levine's strategy, his failure to take obvious steps to get this evidence admitted constitutes a deficiency in his representation. *See Bell*, 2007 U.S. App. LEXIS at *17.

In fact, the Second Circuit has affirmed a grant of *habeas corpus* that was based largely on trial counsel's failure to investigate a witness who would have provided a foundation for the introduction of evidence of third-party culpability. *See Sparman*, 154 F.3d at 52 (affirming Judge Gleeson's grant of *habeas corpus* "substantially for the reasons" he provided). The Court thus finds Judge Gleeson's analysis in *Sparman* instructive here.

In *Sparman*, the court found that trial counsel was constitutionally deficient in failing, *inter alia*, to interview a witness who had information that a third party – not the defendant – had committed the crime. *Sparman v. Edwards*, 26 F. Supp. 2d 450, 467 (E.D.N.Y. 1997). The court held that had counsel interviewed this potential witness and elicited this testimony at trial, counsel would have been able to "establish[] a sufficient nexus between" the third-party and the crime to introduce evidence regarding the third-party's criminal history. *Id.* at 467-69. The court further held that in denying the petitioner's post-trial motion for relief, the state trial court had "failed to understand the relevance" of an affidavit the witness provided post-trial containing information about the third party. *Id.* at 468-69. Specifically, the trial court failed to place this information in context of the other evidence presented at trial because the evidence collectively would have "severely impair[ed] the prosecution's" case by showing that the third party had committed the crime of which defendant was convicted. *Id.* at 468. In *Sparman*, the court explained that counsel should have known to interview the witness prior to trial in part because the defendant so instructed. *Id.* at 451.

Here, although Schulz apparently did not instruct Levine to interview Ruiz, Levine had an even greater reason to interview her than the counsel did in *Sparman*: Ruiz was an eyewitness to the crime who could have confirmed that Guilfoyle was the perpetrator. Further, like the trial court in *Sparman*, the state court here unreasonably failed to contextualize the Ruiz Affidavit. In the context of Ruiz's failure to identify Schulz in court, the Ruiz Affidavit provided evidence that Levine was deficient in failing to interview her prior to trial because such an interview would likely have provided the "nexus" the state court explicitly demanded under *Primo*. As in *Sparman*, then, Levine's failure to conduct this interview had no conceivable

---

[14] Respondent argued at the October 5 Hearing that Ruiz's identification of Schulz may have been "solidified" if Levine had showed her the Guilfoyle photograph prior to trial, (October 5 Hearing Tr. at 59), thus adversely affecting the defense. The Court is unpersuaded by this argument. There is no indication how showing her the Guilfoyle photograph would have solidified such identification. Either Ruiz was going to identify Schulz as the robber in court as expected, or she was not. Moreover, while the prosecution may have been able to introduce Ruiz's photo array if she identified Guilfoyle as the robber in court, this would have merely served to impeach Ruiz's testimony. The benefit of introducing the Guilfoyle photograph would have vastly outweighed any harm from the impeachment of Ruiz's credibility. In any event, as discussed *supra*, any purported strategic reason not to interview Ruiz is completely contradicted by Levine's own affidavit, which clearly stated that no such strategy existed. Instead, Levine states unequivocally that he wanted to interview Ruiz as part of his trial strategy (but was denied that opportunity by the prosecutor).

strategic justification and was based on no apparent reasonable judgment. Levine's "[duty] was to investigate, not to make do with whatever evidence fell into his lap." *Garcia*, 459 F. Supp. 2d at 277, 286 (finding counsel deficient where, *inter alia*, "thorough [pretrial] interview of [witness] . . . would have produced substantial testimonial evidence supporting . . . defense").

Not only would interviewing Ruiz have likely enabled Levine to introduce evidence about Guilfoyle, but would have also given Levine additional material to impeach Velasquez, the only other eyewitness. Specifically, Ruiz's identification of Guilfoyle would have undermined Velasquez's identification of Schultz. Moreover, Ruiz would have testified that Velasquez pointed petitioner out to her in the photo array and later told her, if she did not help put Schulz in jail, he would get out of jail and hurt her. This testimony by a witness like Ruiz with no motive to lie would have completely undermined the sole identification witness. *See Bell*, 2007 U.S. App. LEXIS at *16-*18 (finding that where "the only evidence identifying a criminal defendant as the perpetrator is the testimony of a single witness," failure to investigate means of impeaching witness constitutes ineffective assistance of counsel); *Lindstadt*, 239 F.3d at 200 (finding ineffective assistance of counsel where failure to investigate witnesses prevented counsel from "shak[ing] the testimony of the only percipient witnesses"); *see also Batten v. Greiner*, 97-CV-2378, 2003 U.S. Dist. LEXIS 16923, at *25-*26 (E.D.N.Y. Aug. 26, 2003) (finding counsel erred in failing to procure witness who could have undermined prosecution's eyewitness' testimony). Here, where Levine anticipated the testimony of only two eyewitnesses, he inexplicably failed to investigate testimony that would have significantly undermined not only Ruiz's identification of Schulz, but Velasquez's as well.

### (B) THE PROSECUTOR'S ALLEGED REFUSAL TO PERMIT AN INTERVIEW OF RUIZ

In his post-trial affidavit, Levine recognized the importance of interviewing Ruiz and showing her the photograph, and stated that he wanted to interview her prior to her trial testimony. The only reason given for not doing so was the prosecutor's purported denial of his request for an interview. However, even assuming *arguendo* that the prosecutor denied him access to the witness on the day of her trial testimony (even though the prosecutor would have no legal basis for doing so), Levine's failure to pursue that alleged denial with the trial court cannot be excused under *Strickland*.

New York State courts have consistently held that prosecutors may not refuse defense counsel requests for interviews with prosecution witnesses, and that courts will enable these interviews if necessary. *See, e.g., People v. Doty*, 423 N.Y.S.2d 797, 799 (N.Y. App. Div. 1979) (noting that trial court had asked government informant to come to court for interview with defense counsel); *People v. Marino*, 385 N.Y.S.2d 918, 918 (Monroe Cty. 1976) ("Defense counsel has the right to interview the People's witnesses."); *People v. Eanes*, 350 N.Y.S.2d 718, 718 (N.Y. App. Div. 1973) ("We know of no rule or law which prohibits defense counsel from interviewing a person who has appeared at the request of the prosecutor. . . .); *People v. Cusano*, 313 N.Y.S.2d 833, 834 (Nassau Cty. 1970) ("[D]efense counsel does not need permission of the court or the District Attorney to interview or interrogate [potential witnesses]."); *see also People v. Estrada*, 767 N.Y.S.2d 552, 554 (N.Y. App. Div. 2003) (finding no due process violation from prosecution witness' refusal to meet with defense counsel because prosecution did not instruct the witness to refuse). In fact, as the trial court itself stated in denying petitioner's newly discovered evidence claim, Levine could

have "made [an] effort to seek an adjournment or otherwise enlist the court's assistance in securing an opportunity to interview [Ruiz] before she took the stand." (February 23 Memorandum at 3.)

Therefore, because legal precedent clearly provided that Levine could have sought the court's assistance to permit an interview of Ruiz despite any alleged prosecution efforts to prevent it, the Court finds Levine's failure to interview Ruiz (who was a key prosecution witness) on that sole ground fell below the objective standard of reasonableness under prevailing professional norms as set forth in *Strickland*. *See Batten v. Greiner*, No. 97-CV-2378, 2003 U.S. Dist. LEXIS 16923, at *26 (E.D.N.Y. Aug. 26, 2003) ("Counsel's failure to take advantage of the procedural mechanisms available to him for the production of this key witness was performance that fell[] below a reasonable professional standard."); *see also Noble v. Kelly*, 89 F. Supp. 2d 443, 463 (S.D.N.Y. 2000) ("Errors caused by counsel's ignorance of the law are errors that run afoul of the objective standard of reasonableness.") (citing *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986)).

In sum, although respondent attempts to provide a strategic decision for Levine's failure to interview Ruiz and show her the Guilfoyle photograph, no such strategy existed. Such an interview (and showing her the Guilfoyle photograph) was risk-free given that it was expected she would identify petitioner at trial. In fact, Levine admitted in his own affidavit that he wanted to interview her as part of his own trial strategy, but he did not do so purportedly because the prosecutor would not let him – an excuse that is clearly constitutionally deficient. This failure, given the Ruiz Affidavit, turned out to be monumental in that it deprived petitioner of the opportunity to obtain critical evidence that would have completely undermined the prosecution case. Neither the Appellate

Division, nor the Court of Appeals, addressed this failure in denying the ineffective assistance claim. Moreover, this error by counsel must also be considered in conjunction with the failure to call the alibi witness. Although the Appellate Division called that decision tactical, the Court is unaware of any alleged deficiencies in the roommate's testimony or in his credibility that would have supported this as a tactical decision. When these decisions are viewed together, it is clear that defense counsel simply abandoned mounting any defense when only one of the two eyewitnesses identified his client. That overall decision was unreasonable under the particular circumstances of this case (especially where the interview of Ruiz had absolutely no disadvantage whatsoever). Thus, the state court's failure to consider these defects as a whole in the context of the evidence at trial – including the wholesale abandonment of petitioner's two-pronged trial strategy – was an unreasonable application of *Strickland*.

(3) OTHER ALLEGED DEFICIENCIES

Petitioner also alleges other deficiencies in trial counsel's performance. First, petitioner argues that Levine should have shown Guilfoyle's photograph to Ruiz while she was on the witness stand. Specifically, petitioner contends that, once Ruiz stated at trial that petitioner was not the robber, there was no disadvantage to showing her the Guilfoyle photograph to see if she recognized it and lay the foundation for its admission. Similarly, petitioner argues in the alternative that Levine could have called police officers involved in investigating Guilfoyle's robberies to establish sufficient similarities to admit the Guilfoyle photograph. The Court, however, need not address whether these decisions were also constitutionally defective. Even assuming there are potential disadvantages to pursuing either one of these courses of action, there were no disadvantages, as noted *supra*, to interviewing Ruiz before her testimony. If

Levine had conducted that interview, he then would have been able to question Ruiz during the trial and gain admission of the Guilfoyle photograph without being concerned that something negative would be elicited from Ruiz that would harm his client's case.

Petitioner also faults Levine for not conducting an adequate pre-trial investigation that petitioner claims would have discovered that a car belonging to Kim Guilfoyle, Anthony Guilfoyle's wife, had a license plate on a 1984 Oldsmobile Cutlass that contained the letter "T" and the number "1" as specified in Velasquez's description of the getaway car's license plate. However, after much exploration, this Court concludes that the license plate evidence is inconclusive. In particular, the documentation supplied by petitioner to support this argument demonstrated that Guilfoyle had title to a car with a license plate containing a "T" and the number "1" as of October 28, 1999, which was many months after the El Classico Robbery. Therefore, it provides no evidence as to the actual plate used on that vehicle at the time of the robbery. Although efforts were made by both sides to obtain information from the Department of Motor Vehicles ("DMV") regarding the license plate for that vehicle on February 3, 1999, respondent submitted an affidavit to the Court indicating that such old records had been purged as part of DMV's standard operating procedure. (See Affidavit of Detective Investigator Patrick R. Mulcahy, dated October 4, 2007, at 1.) Thus, although the Court questions why Levine did not investigate the plates on any Guilfoyle vehicles as part of petitioner's defense, it is not a basis to find that he was ineffective under Strickland, especially under the prejudice prong, given the lack of information regarding what such investigation would have uncovered.

In short, the failure to call the alibi witness combined with the failure to interview Ruiz were constitutionally deficient under the first prong of Strickland and the Court need not consider these other purportedly erroneous decisions by counsel.[15]

## C. PREJUDICE

The second prong of the Strickland test requires petitioner to show that "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Murden, 497 F.3d at 198 (quoting Strickland, 466 U.S. at 694; Pavel, 261 F.3d (same). "'An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.'" Lindstadt, 239 F.3d at 204 (quoting Strickland, 466 U.S. at 691). Moreover, "[u]nlike the determination of trial counsel's performance under the first prong of Strickland, the determination of prejudice 'may be made with the benefit of hindsight.'" Hemstreet v. Greiner, 491 F.3d 84, 91 (2d Cir. 2007) (quoting Mayo v. Henderson, 13 F.3d 528, 534 (2d Cir. 1994).

The Supreme Court has made clear that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." Strickland, 466 U.S. at 696. Consequently, "even serious errors by counsel do not warrant granting habeas relief where the conviction is supported by overwhelming evidence of guilt." Lindstadt, 239 F.3d at 204 see also Wynters v. Poole, 464 F. Supp. 2d 167, 176 (N.D.N.Y. 2006) ("[T]he determination of prejudice necessarily is affected by the quantity and quality of other evidence against defendant") (citing

---

[15] Because the Court has not relied on these grounds, the Court also need not address respondent's argument that these other grounds are unexhausted.

*Strickland*, 466 U.S. at 695). Where the Second Circuit has found insufficient prejudice, the evidence against defendants was very strong, and counsel's error (or purported error) minor in comparison. *E.g., Murden*, 497 F.3d at 199 (finding insufficient prejudice from counsel's failure to investigate certain non-eyewitnesses who could have supported particular defense, where testimony of multiple eyewitnesses contradicted this defense); *Hemstreet*, 491 F.3d at 91-92 (finding prosecution's case "independently strong" even if counsel erred where, *inter alia*, defendant "arguably confessed" to murder to "two separate individuals"); *Bennett*, 2007 U.S. App. LEXIS at *8-*9 (finding that even if counsel had interviewed alibi witness, witness was not credible, alibi defense would not have prevailed, and would have served to impeach defendant in other ways); *Lynn*, 443 F.3d at 253 (finding insufficient prejudice in part because jury was already aware of evidence counsel failed to admit); *see also Seow v. Artuz*, No. 98-CV-72, 2007 U.S. Dist. LEXIS 72208, at *26-*27 (E.D.N.Y. Sept. 27, 2007) (failing to find prejudice where witness that counsel failed to investigate "could not have provided" evidence helpful to defense); *Bridges v. United States*, No. 04 Civ. 2715, 2005 U.S. Dist. LEXIS 15401, at *13-*16 (S.D.N.Y. Aug. 1, 2005) (failing to find prejudice where prosecution presented, *inter alia*, accomplice testimony and recordings of defendant's incriminating conversations with accomplices).

On the other hand, the Second Circuit has found sufficient prejudice to warrant *habeas* relief where defense counsel failed to conduct investigation that "could have vastly increased the opportunity to cast doubt on . . . critical evidence." *Bell*, 2007 U.S. App. LEXIS at *14; *Linstadt*, 239 F.3d at 204 (finding prejudice where counsel failed to investigate witness that could have undermined the credibility of the prosecution's eyewitness); *see also Batten*, 2003 U.S. Dist. LEXIS at *26-*27 (finding prejudice sufficient to warrant *habeas* grant

where, *inter alia*, counsel failed to take sufficient steps to secure witness for trial); *Bohan v. Kuhlmann*, 234 F. Supp. 2d 231, 254 (S.D.N.Y. 2002) (finding prejudice sufficient to warrant *habeas* grant where counsel failed to file alibi notice).

The Court has carefully considered the totality of the prosecution's case against Schulz, and finds that "[t]his [was] a case of underwhelming evidence. . . . All of the evidence against [Schulz] was affected by his counsel's failures." *Linstadt*, 239 F.3d at 205. There was no forensic evidence implicating Schulz. Instead, there were only two eyewitnesses and one did not identify petitioner in court, and the other one (Velasquez) had credibility issues, including (1) the fact that his description of the license plate did not match the getaway car allegedly used by Schulz and (2) the fact that the witness he had a pending gun possession charge at the time of the robbery, which was later reduced to disorderly conduct.

Given that the verdict was based essentially on the testimony of the single eyewitness, the Court concludes that there is a strong likelihood that counsel's errors were pivotal to the outcome of the case. As a threshold matter, the testimony of an alibi witness may have substantially undermined this relatively weak case.[16] More importantly, even apart

---

[16] The Court is unpersuaded by respondent's argument at the October 5 Hearing that Levine's failure to call Tralongo did not prejudice petitioner because the prosecution could have significantly impeached Tralongo regarding the differences between the February 7 Tralongo Affidavit and the March 17 Tralongo Affidavit. The Court finds these differences -- such as Tralongo's differing accounts of who cooked dinner and what television program Schulz was watching -- to be relatively minor. Where the Second Circuit has found that the likelihood of impeachment negated any prejudice from counsel's failure to call a witness, that witness gave "inconsistent versions of the

from the alibi witness, there is a reasonable likelihood that the additional testimony from Ruiz – that counsel undoubtedly would have elicited on cross-examination if he had interviewed her prior to her testimony – would have been devastating to the prosecution case well beyond her failure to identify petitioner. Specifically, Ruiz would have testified to the following: (1) Schulz did not commit the El Classico Robbery; (2) she is 90 percent sure that Guilfoyle did; (3) Velasquez pointed to petitioner's photo in a photo array and informed Ruiz that he was the robber prior to Ruiz's identifying Schulz in that array; (4) prior to trial, Velasquez told her that if she did not help put petitioner in jail, he would be released from jail and hurt her; and (5) as an eyewitness, she is "certain that Stephen Schultz has been convicted of a crime he did not commit." (Ruiz Affidavit ¶¶ 4-9). This testimony would have provided a sufficient basis for the admission of the Guilfoyle photograph and thereby point to an alternative suspect. *See generally Lyons v. Johnson*, 99 F.3d 499, 504 (2d Cir. 1996) ("[T]he identification provided by the prosecution's eyewitnesses were shaky from the start. At a bare minimum, the possibility of misidentification would have raised a reasonable doubt as to [petitioner's] guilt had the jury been permitted to see if there were a resemblance between [petitioner] in this case and [the alternative suspect] . . . ."); *see also Towns v. Smith*, 395 F.3d 251, 260 (6th Cir. 2005) ("The only evidence linking [petitioner] to the crime was the eyewitness testimony of Roland Higgs. We have repeatedly expressed our grave reservations concerning the reliability of eyewitness testimony, . . . and Higgs's identification of [petitioner] was particularly

shaky.") (citations and quotation marks omitted). Moreover, the Ruiz testimony in the affidavit would also have provided an additional strong basis for the jury to discredit Velasquez's identification if they believed he was trying to improperly coach or pressure Ruiz into identifying Schulz as the robber. Had this additional Ruiz evidence been placed before the jury, the Court finds, in light of the evidence at trial, that it is reasonably likely that the outcome of Schulz's trial would have been different. Because counsel's errors undermined confidence in the outcome of the trial, the Court finds that Schulz suffered clear prejudice due to counsel's constitutional deficiencies at trial and the second prong of the *Strickland* test is satisfied.

## V. CONCLUSION

For the reasons set forth above, the Court finds that petitioner has shown that his counsel's performance fell "outside the wide range of professionally competent assistance" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 690. Moreover, given the facts of this case, the Court concludes that the state court's decision to deny petitioner's ineffective assistance claim under *Strickland* "involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).[17]

Accordingly, the Court grants the *habeas* petition. Respondent is ordered to release petitioner from custody within 30 days of the date of this Order unless the state declares its

---

*salient* events." *Hemstreet*, 491 F.3d at 91-92 (emphasis added) (finding "salient" inconsistencies where witness gave differing accounts, *inter alia*, of the number of people present at murder). The differences between the Tralongo Affidavits are not salient and would not have provided significant – if any – grounds for impeaching Tralongo.

---

[17] Because the Court grants the petition on the grounds of ineffective assistance of counsel, the Court need not address the other bases for the petition.

intention, before those 30 days expire, to retry petitioner on the charge against him.[18]

SO ORDERED.

/s/ Joseph F. Bianco.
JOSEPH F. BIANCO
United States District Judge

Dated: November 19, 2007
Central Islip, NY

The attorney for petitioner is William H. Hellerstein, Esq., 250 Joralemon Street, Brooklyn, New York, 11201. The attorney for respondent is Anne E. Oh, Esq., 200 Centre Drive, Riverhead, New York, 11901.

\*\*\*

---

[18] This Court's decision to grant the *habeas* petition should not be viewed in any way as a criticism of the handling of this case by the DA's Office at trial, on appeal, or during this *habeas* proceeding. To the contrary, the DA's Office diligently conducted an additional investigation after the Judge Rosenblatt dissent and also was extremely responsive to this Court's requests for additional information (especially regarding the license plate issue) during the evidentiary phase of the *habeas*. Moreover, in the interest of justice, counsel for respondent's voluntarily called the trial prosecutor during their portion of the evidentiary hearing knowing that her testimony completely undermined the only reason given by Levine for not interviewing Ruiz. Although the District Attorney's Office never uncovered conclusive proof of actual innocence and thus continued to oppose this *habeas* petition, this Cout finds that, even in the absence of conclusive proof of actual innocence, there is a reasonable likelihood that, but for defense counsel's constitutional errors, the result of the trial would likely have been different.

24

EXHIBIT A



1.



2.

A173